THE DEPARTMENT OF HUMAN SERVICES, STATE OF HAWAI`I, Appellant-Appellee,
v.
NUUANU HALE, Appellee-Appellant, and LILLIAN KOLLER, DIRECTOR OF THE DEPARTMENT OF HUMAN SERVICES, STATE OF HAWAI`I, Appellee-Appellee.
No. 27975.
Intermediate Court of Appeals of Hawaii.
November 19, 2008.
On the briefs:
Elton John Bain, E. Mason Martin III, (Kessner Duca Umebayashi Bain & Matsunaga), for Appellee-Appellant.
Mark J. Bennett, Attorney General, Heidi M. Rian, Candace J. Park, Deputy Attorneys General, for Appellant-Appellee.
Lillian Koller, Director, Appellee-Appellee.

NOT FOR PUBLICATION

MEMORANDUM OPINION
FOLEY, Presiding Judge, FUJISE and LEONARD, JJ.
Appellee-Appellant Nuuanu Hale Nursing Home (Nuuanu Hale) appeals from the Circuit Court of the First Circuit's (Circuit Court) Order Reversing the Administrative Hearing Officer's Decision of October 31, 2005 and Affirming Department of Human Services' Determination of Neglect, filed on May 30, 2006, and from the Judgment, entered on May 30, 2006, in favor of Appellant-Appellee Department of Human Services, State of Hawai`i (DHS).[1] In the proceedings below, a DHS investigation initially determined that Nuuanu Hale abused a nursing home resident by failing to perform proper catheter care and maintenance based on the resident's condition upon admittance to the hospital and the lack of documentation of catheter care. However, after a full hearing, a Hearing Officer from the Administrative Appeals Office of DHS entered findings of fact and concluded that DHS had incorrectly confirmed abuse by Nuuanu Hale. Upon an appeal by DHS, the Circuit Court reversed the Hearing Officer's decision.
Nuuanu Hale brings this secondary appeal and shows that the record on appeal contains substantial evidence supporting the Administrative Hearing Officer's determination that Nuuanu Hale did not abuse or neglect its nursing home resident. Therefore, this court must reverse the Circuit Court's Judgment and the underlying order.

I. BACKGROUND
DHS initiated an investigation prompted by an Adult Abuse and Neglect Case Report (Abuse Report) on March 9, 2004, which alleged that Nuuanu Hale abused a seventy-nine year old female resident (Client A),[2] based on her vaginal infection and the condition of her Foley catheter upon admittance to the hospital.[3] A Foley catheter is a tube inserted into the urethra (urinary tract) in order to drain urine from the bladder into a Foley bag.
On March 5, 2004, Client A was brought to St. Francis Medical Center Liliha's (St. Francis) emergency room at about 2:15 p.m. for respiratory distress. The next day, March 6, 2004, Client A died at 10:05 p.m.
According to the Abuse Report, MD#1,[4] a treating doctor at St. Francis, reported several concerns that Client A might have been neglected:
1. SEVERE VAGINAL LESION WITH DISCHARGE AND SKIN [NECROSIS].
 "WHOLE" VAGINAL AREA REPORTED TO BE "ENLARGED AND PUSSY."
 L[A]BIA REPORTED TO HAVE SKIN [NECROSIS].
 TWO POSSIBLE HOLES IN THE URET[HRA].
2. [Client A] HAD SEPSIS. DEFINITE CAUSE UNKNOWN. SEPSIS MAY BE DUE TO BILATERAL PNEUMONIA AND/OR VAGINAL LESION. [Client A] ALSO NOTED TO HAVE MULTIPLE ORGAN FAILURE.
. . . .
MD#1 STATES THERE ARE CONCERNS AS THERE ARE INDICATIONS OF" PROLONGED," USE OF THE FOLEY CATHETER. FACILITY [Nuuanu Hale] DOES NOT APPEAR TO HAVE BEEN CHECKING THE FOLEY CATHETER DUE TO CONDITION OF [Client A] AND VAGINAL AREA, BUT DR. WILL NOT CONFIRM NEGLECT, ALSO ADDING HE WILL NOT MAKE AN HPD REPORT AS THIS SHOULD BE [Adult Protective Services's] POSITION TO DO SO.
The Abuse Report indicated that Client A was reported to have been comatose for "a long time," and thus, was non-verbal and non-ambulatory.
An autopsy of Client A was performed on March 11, 2004. The medical examiner's autopsy report, dated June 9, 2004, stated:
Based on these autopsy findings and the investigative and historical information available to me, in my opinion, this 79-year-old woman died as a result of sepsis, most likely originating from an infected urethral perforation associated with prolonged urinary bladder catheterization. Additionally, she had two decubitus ulcers, one Stage III and the other Stage I, and limb contractures. Vitreous electrolyte levels were not diagnostic for dehydration. Her heart showed changes which could reflect severe occlusion of her coronary arteries by lipids. The manner of death is categorized as undetermined since it is unclear whether her perineal and other care conformed to general nursing care standards and to local nursing care guidelines at the nursing home. It is also unclear how much the decedent's diabetes and generalized debility predisposed her to infection.
The medical examiner concluded that Client A died of sepsis,[5] and included elder neglect and arteriosclerotic cardiovascular disease as contributing causes or other significant conditions.
After an investigation,[6] on July 29, 2004, DHS issued a Notice of Disposition of the Adult Protective Services Investigation, confirming "Negligent Treatment/Maltreatment" of Client A.
On October 26, 2004, Nuuanu Hale requested an administrative hearing to dispute DHS's confirmation of abuse/neglect of Client A.
On February 22, 2005 and March 22, 2005, an administrative hearing was held before Steven Royal, the Hearing Officer for the Administrative Appeals Office of DHS (Hearing Officer Royal). The issue at the administrative hearing was whether DHS properly confirmed abuse/neglect as the result of negligent treatment/maltreatment by Nuuanu Hale of Client A. During the hearing on February 22, 2005, DHS stated two positions: 1) DHS did not find any documentation by Nuuanu Hale of adequate Foley care; and 2) "there's also a problem with monitoring of [Client A's] vaginal or perineal area."[7]
James J. Navin, M.D. (Dr. Navin), a pathologist in obstetrics and gynecology, was retained by Nuuanu Hale as an expert witness to conduct an independent analysis of the medical examiner's autopsy report and the allegations put forward by DHS. Dr. Navin reviewed "years of [Client A's] records" at Nuuanu Hale. Dr. Navin also provided a written report.
At the administrative hearing, Dr. Navin explained his review and opinion of Client A's medical history and conditions leading up to her death and the autopsy report. He summarized in detail the ailments Client A experienced in the days prior to her death. He testified that on March 1, 2004, Client A had a temperature of 102 Fahrenheit (F), had a large amount of foamy white mucous at the mouth, which was suctioned.[8] Nuuanu Hale's staff reported her condition to Steven M.C. Lum, M.D. (Dr. Lum), who was Client A's primary care physician during her fourteen years at Nuuanu Hale. Dr. Lum ordered antibiotics. On March 2, 2004, Client A's temperature was elevated, but then it went down to 100F, and Client A had a large amount of thick yellow mucous, which needed to be suctioned twice. Dr. Navin's written report showed that, on March 4, 2004, Client A had a temperature of 99.6F, no suctioning was needed, and she had no signs of aspiration.[9] On March 4, Client A had high blood sugar levels and Dr. Lum increased her insulin. Also, her temperature reached 100.3F and she was suctioned twice for thick creamy mucous. Rashes were more pronounced at the groin, and there were rashes on the buttocks. On March 5, Client A's temperature reached 101.7F, her glucose level was elevated, and she was in acidosis.[10] The charge nurse suggested Client A go to the emergency room and Dr. Lum agreed.
Dr. Navin testified that Foley care was mentioned in the daily, weekly, and monthly summaries, although the summaries did not detail what specific tasks were performed. Nuuanu Hale's Progress Notes also indicated that Client A's Foley catheter was "patent and intact," or "okay" from March 2 through March 3, and the March 4 notes mentioned something regarding the Foley catheter that was indiscernible.
Dr. Navin discussed his review of the autopsy report and testified that he went to the medical examiner's office and looked at tissue samples. Dr. Navin concluded that Client A aspirated, and within a reasonable degree of medical probability, Client A's abscess in the urethra occurred within a two-day period. Dr. Navin also testified that Client A's ulcerated and necrotic lesions on her vulva and vagina were conditions of her bullous pemphigoid, which she had been suffering for a number of years. He also testified that it was more likely than not that the perforation in her urethra was caused by a possible jerking motion when she was transported to the hospital with the catheter still in place, and that Client A was susceptible to trauma and infection because she had been using a Foley catheter for months. Dr. Navin explained that since Client A was on antibiotics and steroids and had ulcerated lesions, she developed a yeast infection. As a result, he concluded, any lack of Foley care did not lead to her bullous pemphigoid, pneumonia, or contribute to her death. As an aside, Dr. Navin opined that the lung abscess was the actual cause of death.
Norman Goldstein, M.D. (Dr. Goldstein), a dermatologist, treated Client A for bullous pemphigoid since 2003, when she initially suffered from widespread dermatophyte infection and nummular dermatitis. He explained in a letter to Nuuanu Hale's counsel, dated February 18, 2005, that bullous pemphigoid "is a chronic blistering condition seen very often in elderly people," and that most patients with this condition will experience flare-ups in conjunction with their waning health. Dr. Goldstein wrote, "It should be noted that bullous pemphigoid lesions can appear very rapidly and the bullae can become necrotic within a short time." Dr. Goldstein last saw Client A on February 7, 2004, just less than a month prior to her death, and he observed then that "[s]he had an exacerbation of the bullous pemphigoid with impetiginization and folliculitis." Apparently referring to the time of her death, Dr. Goldstein noted that because of Client A's "diabetes and other debilitating general medical problems, she had a flare-up of her bullous lesions." He also stated that he understood that Client A was taken off the Foley catheter on July 24, 2003, but her dermatitis recurred, and she recommenced use of the Foley catheter in August 2003. Dr. Goldstein also told Dr. Lum that Client A would have this condition for some time.
In a letter to Dr. Lum, dated February 7, 2004, the day Dr. Goldstein last saw Client A, Dr. Goldstein explained that Client A had "multiple large, widespread, drying bullae with secondary impetiginization. It appeared that the fungus infection had cleared, but this now represents a recurrence of her bullous pemphigoid with secondary folliculitis and impetiginization." Dr. Goldstein wrote orders for medication to treat Client A's skin condition and informed Dr. Lum that Client A "will be having more troubles so, if she does not do well, please have the staff contact me."
Dr. Navin testified that he also read Dr. Goldstein's report[11] and agreed with the latter's opinion on the timing of bullous pemphigoid flare-ups. Overall, Dr. Navin concluded that he could not find evidence of elder neglect, the sepsis was due to pneumonia, and Client A had pneumonia for some time before the urethral abscess. Lastly, Dr. Navin testified that he has "seen bullous pemphigoid grossly and microscopically because the dermatologists biopsy it" and send him the biopsies. He described the characteristics of bullous pemphigoid as an "ugly process . . . . with shaggy-looking . . . not little blisters; these are big blisters, and then they become necrotic and the tissue sloughs off the surface." Dr. Navin testified that an emergency room doctor "could easily interpret this as evidence that no one was caring for this lady's skin."
Dr. Lum submitted a letter to Nuuanu Hale's counsel, dated March 14, 2005, which Hearing Officer Royal considered in his decision. Dr. Lum summarized Client A's medical conditions and his opinion on Dr. Navin's report:
When [Client A] initially entered the facility she already had multiple medical conditions. These included a long standing history of diabetes mellitus type II, multiple cerebral strokes, advanced cerebral vascular ischemic disease, osteoarthritis. She was awake but nonverbal, incontinent of feces and urine, bedridden without any significant functional use of her arms or legs. She required a gastric tube for feedings due to chronic dysphagia. As mentioned by Dr. Goldstein she developed bullous pemphigoid with reccurent [sic] flares associated with secondary folliculitis.
During the years at Nuuanu Hale, [Client A] was treated for episodes of [aspiration] pneumonia, urinary tract infections and [flare-ups] of her [bullous] pemphigoid. Attempts were made to discontinue her foley catheter and switch to diapers, but she developed increasing skin irritation and inflammation, making the chronic use of the foley [catheter] necessary.
During my visits to see this patient throughout the 14 years, I always found her to be clean and well cared for. . . . Except during flareups [sic] of the pemphigoid, her skin was always of good texture and turgor. I did not do a formal speculum or bimanual vaginal exam, but never witnessed any vaginal discharge. The foley catheter and urethral insertion site looked clean, without redness or swelling.
. . . . I have read Dr. James Navin's report and agree with his assessment. I believe [Client A] was doing well until the last several days of her stay at Nuuanu Hale. The pneumonia, sepsis and out of control diabetes led to a[n] acute flare [up] of her pemphigoid causing not only the severe deterioration of her integument, but the lesions involving her vulva and vagina. This could easily on first glance appear to be a condition of chronic abuse, when in reality the entire picture rapidly developed in only a matter of days. The urethral laceration I agree most likely occurred during transport to the emergency room.
I have been taking care of my patients in a number of different nursing facilities for the past twenty years. I do not have a problem with foley care status being charted on a weekly basis instead of daily. I have always found the care given to my patients at Nuuanu Hale to be satisfactory.
Nuuanu Hale's Physician's Orders show that as early as August 12, 2003, Dr. Lum ordered the Foley catheter to be inserted for three months or until Client A's buttocks excoriation healed. Also, on February 20, 2004, he ordered Nuuanu Hale to "renew use of indwelling foley catheter" for three months because of severe excoriation of Client A's groin, buttocks, and perineal areas.
Jolaine Hao, R.N. (Nurse Hao), who appeared at the administrative hearing for the Adult Protective Services (APS) Unit, argued at the hearing that Nuuanu Hale's policy and procedure for perineal[12] and Foley care was not followed because there was no documentation and because of the condition of Client A when she entered the emergency room. Hearing Officer Royal asked whether it was typical to omit details in the notes, such as washing the perineal area, when it is done on a daily basis. Nurse Hao explained that from her experience, every facility has different policies about documentation. She stated, "Acute facilities like Queen's Hospital have very strict policies about documentation. Long-term care facilities in general tend to be a little more lax."
Nuuanu Hale provided a copy of instructions from a training manual used to educate its certified nurse's assistants (CNA ), titled "Helping a Person with a Complete Bed Bath," which includes step-by-step instructions on perineal care for females. Included among the many steps was separating the labia and cleaning both sides with a wash cloth, using soap and water, and drying the area thoroughly.
DHS provided a copy of instructions for Foley care, titled "Foley Catheter Care and Maintenance," which was obtained from Nuuanu Hale. The instructions provide a diagram of the Foley catheter attached to the body of a female. The instructions also state that a "foley catheter is a potential source of infection. Factors which enhance the possibility of infection when a foley catheter is in place: inadequate fluid intake, poor hygiene, trauma to the urinary meatus, and retrograde urine flow. Care and maintenance of the foley catheter are geared to minimize the above factors." Required among the many steps of Foley care are cleansing the external meatus[13] with soap and water and a swab with Betadine daily. Foley care also requires checking for blockage of mucous or sediment and leakage of urine; if a blockage is suspected, then the catheter should be changed rather than irrigated. The instructions also provide that the date, time, and catheter size be noted in the chart whenever a catheter is inserted or changed. Neuman Kwong, R.N. (Nurse Kwong) from the APS Unit also appeared at the administrative hearing and explained the difference between perineal care and Foley care. One difference is that perineal care is a general washing and can be done during a shower, and documentation of perineal care is "a bit more lax" in a nursing home, whereas Foley care is "more intensive" because "there's a high risk for infection." Nurse Kwong summarized the steps for Foley care and explained their importance:
And in a nursing facility, what we do is, in foley care, we used to be taught as nurses to take either betadine, which is to scrub the area where the foley inserts into the meatus, which is the vaginal  the hole where the shi-shi comes out. You would take betadine and you would take a swab, and you'd go all the way up to where the insertion is, and you literally clean it from inside out. So that way, it helps to keep infection from happening. . . . if you don't use betadine, the next best thing is usually in a nursing long-term facility like this, you would use soap and water every day. And it is a very specific procedure, because it has be to very clean. Because you're introducing, it's a port, what they call port to infection. So basically, you have to be very specific in doing that. So one of the problems I had was, there was no documentation of foley care . . . .
Nuuanu Hale's counsel raised at the administrative hearing that the Foley catheter was documented as being intact on March 2nd and 3rd, but Nurse Kwong responded that the Foley catheter can appear "patent and intact" without looking at the vaginal area because the urine draining into the Foley bag indicates that the catheter is intact. Nurse Hao testified that a Foley catheter can be observed outside of the pants, but Foley care means cleaning the portal of entry into the urethra.
According to DHS's Log of Contacts Report  Case Process (Contacts Log), Nurse Kwong spoke with MD#2, Dr. Goldstein, on March 12, 2004, several days after Client A's death. Dr. Goldstein reportedly told Nurse Kwong that he was unaware of Client A's genital infection, that she had bullous pemphigoid which could appear anywhere on the body, that the disease causes blistering and necrosis, and that Client A's skin condition had been on and off. Nurse Kwong also spoke with MD#3, Dr. Lum, on the same day, and he reported that the condition of Client A's genital area upon her death may have been due to her disease process, that he had not seen Client A's genital area for at least six months, and that there may not have been clinical signs of the infection in Client A's genital area for the staff to notice.
Nurse Kwong also spoke with several members of Nuuanu Hale's staff on March 10 and 11, 2004. The registered nurse (Staff #3) and charge nurse (Staff #4) who were in charge of Client A did not observe any neglect or infection or skin condition on Client A, other than the rash that she had, and they did not note anything of concern regarding her perineal area that would require immediate attention until the day she was admitted to St. Francis. They both stated that Foley care was done, but that it was not always documented. Staff #3 said she worked with Client A regularly and that she had swelling and redness in her vaginal area, but no infection. Staff #3 did not notice any pus or necrotic tissue to Client A's vaginal area. Staff #3 also reported that she worked the day shift and would be the one to do Foley care, but she did not document it in the chart daily. Staff #4 reported that he also did not notice Client A to have an infection in her vaginal area, such as necrosis or pus.
On October 31, 2005, Hearing Officer Royal issued a Notice of Administrative Hearing Decision (Hearing Decision). Based on detailed findings of fact and conclusions of law, which included mixed questions of fact and law, Hearing Officer Royal determined that DHS incorrectly confirmed that Nuuanu Hale abused Client A at its facilities by means of negligent treatment. Hearing Officer Royal further determined that Nuuanu Hale did not neglect Client A by failing to observe and act on medical conditions that threatened her health.
On November 30, 2005, DHS appealed to the Circuit Court from the Hearing Decision. Notably, DHS did not challenge any of Hearing Officer Royal's findings of fact or mixed findings and conclusions, but asked the Circuit Court to conclude that: "The Hearing Officer committed reversible error because there is sufficient evidence in the record to support DHS's determination that Nuuanu Hale had neglected Client A."
Oral argument was held on May 10, 2006. At the oral argument, the Circuit Court heard both parties' arguments concerning the perineal and Foley catheter care of Client A and reversed the Hearing Decision, ruling in favor of DHS.
On May 30, 2006, the Circuit Court filed an Order Reversing the Administrative Hearing Officer's Decision of October 31, 2005 and Affirming Department of Human Services' Determination of Neglect based on the finding that Hearing Officer Royal's decision was clearly erroneous because the Circuit Court was firmly convinced that a mistake had been made in view of the reliable, probative, and substantial evidence in the record. Judgment was entered on the same day in favor of DHS. Nuuanu Hale timely filed a Notice of Appeal on June 9, 2006.

II. POINTS ON APPEAL
Nuuanu Hale raises the following points of error:
1. The Circuit Court erred in reversing the Hearing Decision, which was based on the reliable, probative, and substantial evidence provided by Nuuanu Hale; and
2. The Circuit Court erred in concurrently affirming the initial DHS determination of neglect.

III. STANDARDS OF REVIEW
An appellate court's review of a circuit court's review of an administrative agency's decision is a secondary appeal. Yasumura v. Child Support Enforcement Agency, 108 Hawai`i 202, 208, 118 P.3d 1145, 1151 (App. 2005) (citation omitted). This court must determine whether the Circuit Court's decision was right or wrong by applying the standards set forth in HRS § 91-14(g) (1993) to the agency's decisions. Id. Section 91-14(g) provides:
Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
(1) In violation of constitutional or statutory provisions; or
(2) In excess of the statutory authority or jurisdiction of the agency; or
(3) Made upon unlawful procedure; or
(4) Affected by other error of law; or
(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
Pursuant to HRS § 91-14(g), "an agency's conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3); findings of fact are reviewable under subsection (5); and an agency's exercise of discretion is reviewable under subsection (6)." Yasumura, 108 Hawai`i at 208, 118 P.3d at 1151 (citation and internal quotation marks omitted). An "agency's decision carries a presumption of validity and appellant has the heavy burden of making a convincing showing that the decision is invalid because it is unjust and unreasonable in its consequences." Id. (citations and internal quotation marks omitted).
The appellate court determines whether an agency's findings are clearly erroneous in view of reliable, probative, and substantial evidence on the whole record. Tauese v. State of Hawai`i, Dept. of Labor and Indus. Relations, 113 Hawai`i 1, 25, 147 P.3d 785, 809 (2006) (citations omitted). Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. Jou v. Schmidt, 117 Hawai`i 477, 482, 184 P.3d 792, 797 (App. 2008). Under the clearly erroneous standard, the appellate court will uphold an agency's findings unless the court is "left with a firm and definite conviction that a mistake has been made." Tauese, 113 Hawai`i at 25, 147 P.3d at 809 (citations and internal quotation marks omitted).
The appellate court reviews conclusions of law de novo, under the right/wrong standard. Capua v. Weyerhaeuser Co., 117 Hawai`i 439, 444, 184 P.3d 191, 196 (2008). A conclusion of law is not binding on an appellate court and is freely reviewable for its correctness. Id.
Appellate courts review agency decisions which present mixed questions of fact and law under the clearly erroneous standard "because the conclusion is dependant upon the facts and circumstances of the particular case." In re Contested Case Hearing on Water Use Permit Application Filed by Kukui (Molokai), Inc., 116 Hawai`i 481, 489, 174 P.3d 320, 328 (2007) (citation and internal quotation marks omitted). An appellate court must give deference to an agency's expertise and experience in the particular field with regard to mixed questions of fact and law, and the appellate "court should not substitute its own judgment for that of the agency." Peroutka v. Cronin, 117 Hawai`i 323, 326, 179 P.3d 1050, 1053 (2008) (citation and internal quotation marks omitted).

IV. DISCUSSION
DHS argues that the Circuit Court's Order is supported by substantial evidence in the record and therefore this court should affirm. DHS claims that Nuuanu Hale abused Client A by failing to provide timely and adequate care of Client A by not providing proper care and monitoring of her Foley catheter. DHS also claims that Client A's condition, as reported by the ER doctor, and the lack of documentation by Nuuanu Hale indicate a lack of proper Foley care.
Nuuanu Hale argues that the record supports an alternative explanation for Client A's condition, which is that in a short time, Client A suffered a flare-up of a pre-existing condition of bullous pemphigoid, which progressed quickly in a matter of hours, and the appearance of this flare-up suggested the occurrence of abuse. Also, Nuuanu Hale claims that it provided Client A perineal care, including monitoring of the vaginal area from February 25, 2004 to March 5, 2004. Nuuanu Hale explained that Client A was prone to sudden flare-ups of bullous pemphigoid due to her other medical conditions, such as diabetes. DHS counter-argues that substantial evidence in the record contradicts Nuuanu Hale's claim that Client A's infected vaginal area was due to a rapid flare-up of bullous pemphigoid. Based on the record on appeal, we conclude that substantial evidence supports the Hearing Decision, including findings of fact supporting, inter alia, Nuuanu Hale's contention that Client A suffered from a flare-up of bullous pemphigoid when she was admitted to St. Francis, and that Nuuanu Hale did not fail to provide proper Foley catheter care and monitoring.

A. Nuuanu Hale Provided Proper Foley Care and Monitoring
In the Hearing Decision, Hearing Officer Royal determined that DHS incorrectly confirmed abuse as defined by Hawaii Revised Statutes (HRS) § 346-222 (1993) and Hawai`i Administrative Rules (HAR) § 17-1421-2 because Nuuanu Hale did not neglect Client A by failing to observe and act on medical conditions that threatened her health and ultimately her life.
HAR § 17-1421-2 provides that the terms "abuse" and "dependent adult" shall be defined in HRS § 346-222. HRS § 346-222 defines "abuse" and "dependent adult" in relevant part:
"Abuse" means actual or imminent physical injury, psychological abuse or neglect, sexual abuse, financial exploitation, negligent treatment, or maltreatment as further defined in this chapter.
Abuse occurs where:
(1) Any dependent adult exhibits evidence of:
(A) Substantial or multiple skin bruising or any other internal bleeding;
(B) Any injury to skin causing substantial bleeding;
(C) Malnutrition;
(D) A burn or burns;
(E) Poisoning;
(F) The fracture of any bone;
(G) A subdural hematoma;
(H) Soft tissue swelling;
(I) Extreme physical pain; or
(J) Extreme mental distress which includes a consistent pattern of actions or verbalizations including threats, insults, or harassment, that humiliates, provokes, intimidates, confuses, and frightens the dependent adult;
and the injury is not justifiably explained, or where the history given is at variance with the degree or type of injury, or circumstances indicate that the injury is not the product of an accidental occurrence;
. . . .
(3) Any dependent adult is not provided in a timely manner with adequate food, clothing, shelter, psychological care, physical care, medical care, or supervision;
. . . .
(5) There has been a failure to exercise that degree of care toward a dependent adult which a reasonable person with the responsibility of a caregiver would exercise, including, but not limited to, failure to:
(A) Assist in personal hygiene;
(B) Provide necessary food, shelter, and clothing;
(C) Provide necessary health care, access to health care, or prescribed medication;
(D) Protect a dependent adult from health and safety hazards; or
(E) Protect against acts of abuse by third parties;
(6) Any dependent adult appears to lack sufficient understanding or capacity to make or communicate responsible decisions concerning the dependent adult's person, and appears to be exposed to a situation or condition which poses an imminent risk of death or risk of serious physical harm[.]
. . . .
"Dependent adult" means any adult who, because of mental or physical impairment is dependent upon another person, a care organization, or a care facility for personal health, safety, or welfare.
(Brackets and emphases added.) HAR § 17-1421-2 defines "negligent treatment" and "maltreatment" as:
the failure to provide that degree of care toward a dependent adult which a reasonable person with the responsibility of a caregiver would exercise in providing necessary food, shelter, clothing, supervision, health care, access to health care, prescribed medication, or in protecting the dependent adult from health and safety hazards, including acts of abuse by third parties, as defined in the definition for "abuse" in section 346-222, HRS.
Pursuant to HRS § 91-10(5) (Supp. 2003) on the rules of evidence in administrative procedures, "the party initiating the proceeding shall have the burden of proof, including the burden of producing evidence as well as the burden of persuasion," except as otherwise provided by law. (Emphasis added.) The burden of proof is a preponderance of the evidence. Id. Nuuanu Hale had the burden of proof in the administrative proceeding because it requested the administrative hearing.
The Hearing Decision explained that the lack of documentation of the exact steps taken in Client A's perineal care does not indicate that such care did not take place:
According to the charts of [Nuuanu Hale], foley care is specifically referenced in [Nuuanu Hale's] Progress Notes from March 2, 2004, through March 4, 2004, and the foley catheter is reported to be intact. The Department rebutted that, notwithstanding an intact and patent foley catheter, "Client A's" vaginal area was not actually observed. However, the "Nurse's Record" for the time period in question also indicates that "Client A" was bathed each of the days prior to her admission to St. Francis Hospital. The sequence in which a patient receives a `complete bed bath' is outlined in the exhibits received from [Nuuanu Hale] in the "Helping a Person with a Complete Bed Bath." According to the document, the pubic area and perineal area are washed with soap and the bathing includes separating the labia. Although, the record is void of the nursing staff manually recording separation of the labia majora and observing the labia minora, there are at least sixteen (16) steps listed in" Perineal Care for Females" under "Helping a Person with a Complete Bed Bath." The fact that explicit details, as to the bathing of "Client A's" genital area, are not documented in the charts provided by [Nuuanu Hale] does not inherently equate to a finding that the necessary bathing and observation did not take place. If the Department [DHS] provided documentation of [Nuuanu Hale] regularly recording details of "Client A's" genital and perineal bathing but failed to provide documentation in the days leading up to "Client A's" hospitalization on March 5, 2004, more weight would be afforded this fact. However, in this case, the Department's witnesses and [Nuuanu Hale's] witnesses concurred that detailed documentation of routine bathing in a long term facility is lax when compared to a hospital. Additionally, in support of [Nuuanu Hale's] position, the record reflect that the nursing staff at [Nuuanu Hale] observed and recorded a rash on" Client A's" buttocks that spread to her genital area the day before admittance to St. Francis Hospital. This evidence and testimony supports [Nuuanu Hale's] position that the nursing staff observed and recorded any abnormalities with respect to "Client A's" genital and perineal area.
The record on appeal substantially supports the above-quoted discussion in the Hearing Decision. For instance, Dr. Navin testified at the administrative hearing that daily Foley care was mentioned in the daily, weekly, and monthly summaries, such as whether the catheter was leaking, and whether or not the urine was cloudy or clear. Dr. Navin explained that Nuuanu Hale's records "talk about foley care[,]" but "[t]hey don't detail what they did." Nuuanu Hale's progress notes show that the Foley catheter was intact and patent from March 2 through March 3, 2004. However, on March 4, 2004, the progress notes indicated that rashes were more pronounced at the groin, and rashes were found on the buttocks. The progress notes also make some (unclear) reference to the Foley catheter.
DHS argues on appeal that a report that the Foley catheter is "intact and patent" simply means that the urine is draining and collecting in the bag. Nurse Kwong testified that when a nurse sees urine draining in the bag, the Foley catheter is described as intact, but this does not necessarily mean that the nurse looked at the vaginal area. Also, Nurse Hao testified that the catheter can be seen outside of the pants and could be described as intact if the urine is draining into the bag.
However, the record on appeal shows that Nuuanu Hale's staff performed perineal care, which involved a closer examination of the vaginal area, where the Foley catheter was inserted. Nuuanu Hale's Nurse's Record for the period February 25, 2004 through March 5, 2004 shows that Client A was given a bed bath or shower during the 7 a.m. to 3 p.m. day shift, and a bed bath only on March 2, 3, 4, and 5. According to the Nurse's Record, Foley checks were also performed from February 25 through March 5, and Client A was noted to be continent throughout that period except from the evening of March 3 through March 5.
Nuuanu Hale also submitted letters written and signed by its CNAs stating that they provided Client A with routine perineal care by washing her perineal area with perineal wash and drying the area on February 25, 26, 27, and 28, and March 1, 2, 3, and 5. However, all of them stated that they did not chart the perineal care they provided in the Nurse's Record.
DHS argues that the lack of documentation of Foley care indicates that it was not performed on Client A, and that an intact and patent Foley catheter does not "prove" that Nuuanu Hale properly cleansed and monitored Client A's Foley catheter. At the administrative hearing, Nurse Hao testified that when a task is not documented, it means that it was not done, and "it's just a basic rule of thumb" that "you learn [] in nursing school." DHS also claims that the letters submitted by Nuuanu Hale's CNAs are unsubstantial evidence of Nuuanu Hale providing proper Foley care and that the letters were unreliable because they were all written more than a year after Client A's death.[14] DHS correctly points out that the Nuuanu Hale Administrator and the Director of Nursing (DON) indicated that the registered nurses and licensed practical nurses were responsible for Foley care, and not the CNAs. However, the DON stated that it was the staff's responsibility to document Foley care in the progress notes, and the registered nurse in charge of Client A told Nurse Kwong that she did Foley care daily, but did not document it in the chart daily.
Upon consideration of the testimony and evidence presented, the Hearing Officer rejected DHS's assertion that the lack of detailed documentation of the specific steps taken warranted a finding that there was an absence of proper Foley care.

B. Client A Suffered from a Flare-Up of Bullous Pemphigoid
Hearing Officer Royal determined that Nuuanu Hale was not negligent in its observations and care of Client A during the days preceding her admittance to St. Francis and that she suffered from bullous pemphigoid:
The objective evidence and testimony from "Client A's" treating doctors, attending nurses and [Nuuanu Hale's] expert witness, is credible and supported by the exhibits with respect to the swift deterioration of "Client A's" condition due to an extremely weak immune system that permitted the Bullous Pemphigoid to spread at a rapid rate and result in purulent [sic] and necrosis at the time "Client A" entered St. Francis Hospital on March 5, 2004. This decision notes that at the time the Department [DHS] confirmed neglect/abuse, it did not have access to all of the information available at the time of the Administrative Hearings. Consequently, the Department's determination of negligence/abuse by [Nuuanu Hale] toward "Client A" was based on an incomplete record. A complete review of the record indicates that [Nuuanu Hale] was not negligent in its observations and care of "Client A" during the days before "Client A's" admittance to St. Francis Hospital on March 5, 2004. The testimony and evidence supports [Nuuanu Hale's] position that "Client A's" condition, including severe vaginal lesions with discharge and skin necrosis, and inflamed vaginal area with purulent (pus) drainage, in all likelihood, was not observable by [Nuuanu Hale's] staff in the days before the nursing staff contacted physicians and requested that" Client A" be admitted to St. Francis Hospital for her rapidly declining medical conditions.
Dr. Navin testified that Client A suffered from a flare-up of bullous pemphigoid, evidenced by ulcerated and necrotic lesions of her vulva and the vagina. Dr. Navin also agreed with Dr. Goldstein's opinion on the timing of the flare-up, and the nature and appearance of lesions. Furthermore, the record on appeal shows Dr. Goldstein prescribed medication for Client A's bullous pemphigoid as early as October of 2003. Although Dr. Goldstein did not indicate the site of her infections and Dr. Lum did not do a vaginal exam, Dr. Lum's orders to Nuuanu Hale to insert the Foley catheter provided corroborating information on Client A's skin infections in the perineal area.
DHS argues that the Hearing Officer should have rejected Nuuanu Hale's claim that Client A's lesions were a result of her bullous pemphigoid because the doctor at St. Francis and the medical examiner did not note any "shaggy-looking, big blisters" on her body. Also, Nurse Hao stated at the administrative hearing that bullous pemphigoid gives off a clear drainage, and pus-like material. DHS also argues that the Progress Notes do not indicate that Client A's bullous pemphigoid flared up. However, Dr. Navin explained that an emergency room doctor who may not be familiar with this disease could misinterpret Client A's condition as evidence of abuse. Dr. Goldstein also reiterated in another letter to Nuuanu Hale's counsel, dated March 14, 2005, that the "bullae of bullous pemphigoid can occur on any part of the skin, including the vaginal area and other mucous membrane sites," and "[s]ometimes the bullae can develop in a matter of hours."
DHS submits that substantial evidence exists to support the Circuit Court's decision reversing the Hearing Decision. Ultimately, DHS argues that Nuuanu Hale's evidence is unpersuasive and urges us to reweigh the evidence and reassess the credibility of the witnesses and the weight of the testimony presented to the Hearing Officer, as it urged the Circuit Court to do. However, that is not the task of the courts on review of agency decisions. We must give deference to the agency's assessment of the credibility of witnesses and the weight given to the evidence. "It is well established that courts decline to consider the weight of the evidence to ascertain whether it weighs in favor of the administrative findings, or to review the agency's findings of fact by passing upon the credibility of witnesses or conflicts in testimony, especially the findings of an expert agency dealing with a specialized field." Moi v. State of Hawai`i, Dept. of Safety, 118 Hawai`i 239, 242, 188 P.3d 753, 756 (App. 2008) (quoting Nakamura v. State, 98 Hawai`i 263, 267, 47 P.3d 730, 732 (2002)).
In view of the entire record on appeal, the Circuit Court erred in reversing the Hearing Decision and concurrently affirming DHS's determination of abuse and neglect. Based on the evidence obtained from Client A's doctors, Nuuanu Hale's staff and expert witness, and medical records, this Court cannot reach a definite and firm conviction that Hearing Officer Royal made a mistake in determining that Nuuanu Hale did not abuse Client A. See Tauese, 113 Hawai`i at 25, 147 P.3d at 809. In addition to the reliable, probative and substantial evidence supporting the Hearing Decision, this Court must adhere to the rule that an agency's decision carries a presumption of validity, and that a court should not substitute its own judgment for that of the agency, in this case the Administrative Appeals Office of DHS. Peroutka, 117 Hawai`i at 326, 179 P.3d at 1053; Yasumura, 108 Hawai`i at 208, 118 P.3d at 1151. As discussed above, we will not pass upon the issues dependent on the credibility of witnesses and the weight of conflicting evidence; this is the province of the Hearing Officer as the finder of fact. The Hearing Officer's conclusions in this case are supported by unchallenged and substantially supported findings of fact.

V. CONCLUSION
For the foregoing reasons, we reverse the Circuit Court's Judgment, entered on May 30, 2006, and the Circuit Court's Order Reversing the Administrative Hearing Officer's Decision of October 31, 2005 and Affirming Department of Human Services' Determination of Neglect, filed on May 30, 2006.
NOTES
[1] The Honorable Eden Elizabeth Hifo presided.
[2] The resident is referred to as Client A to protect her privacy and confidentiality.
[3] Hawaii Revised Statutes (HRS) § 346-224(a) (1993) provides, in part:

Reports. (a) The following persons who, in the performance of their professional or official duties, know or have reason to believe that a dependent adult has been abused and is threatened with imminent abuse shall promptly report the matter orally to the department of human services:
(1) Any licensed or registered professional of the healing arts and any health-related occupation who examines, treats, or provides other professional or specialized services to dependent adults, including but not limited to, physicians, physicians in training, psychologists, dentists, nurses, osteopathic physicians and surgeons, optometrists, chiropractors, podiatrists, pharmacists, and other health-related professionals . . .
[4] The Abuse Report excised the names of the treating physicians and substituted other identifiers, such as MD#1, MD#2, MD#3, etc.
[5] Sepsis is 1) the presence in the blood or other tissues of pathogenic microorganisms or their toxins, or 2) septicemia, a systemic disease associated with the presence and persistence of pathogenic microorganisms or their toxins in the blood, which is also called blood poisoning. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1681 (30th ed. 2003).
[6] HRS § 346-227 (1993) provides:

Upon receiving a report that abuse of a dependent adult has occurred and is imminent, the department shall cause an investigation to be commenced in accordance with this part as the department deems appropriate.
[7] During the same hearing, DHS clarified that it was not arguing that negligent treatment by Nuuanu Hale caused Client A's death.
[8] Dr. Navin's testimony on Client A's conditions preceding her admittance to St. Francis, such as her temperature readings, do not match exactly with Nuuanu Hale's Progress Notes, but his testimony closely correlates to the information in the Progress Notes and his written report.
[9] Aspiration is "1. the drawing of a foreign substance, such as the gastric contents, into the respiratory tract during inhalation. 2. removal by suction, using an aspirator, as of excess fluid or gas from a body cavity or of a specimen for biopsy." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 166 (30th ed. 2003).
[10] Acidosis is "1. the accumulation of acid and hydrogen ions or depletion of the alkaline reserve (bicarbonate content) in the blood and body tissues, resulting in a decrease in pH. 2. the pathologic condition resulting from this process[.]" DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 17 (30th ed. 2003) (brackets added).
[11] Dr. Navin did not specify which report he reviewed.
[12] Perineal means pertaining to the perineum, which is "the region between the thighs, bounded in the male by the scrotum and the anus and in the female by the vulva and anus." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1403 (30th ed. 2003).
[13] Meatus is the "anatomic nomenclature for a passageway in the body, especially one opening on the surface." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1108 (30th ed. 2003).
[14] Two letters were dated March 13 and 14, 2004, several days after Client A's death, but DHS states that the dates are incorrect and refers this Court to the administrative hearing transcript to show that the proper date is March 14, 2005. During the hearing, the incorrect date was noted with regard to the March 13, 2004 letter, but the correct date was not given, and there was no mention of a second allegedly incorrect date.